**In re Samuel BIALAC, Debtor.**

**In re James BIALAC, Debtor.**

**Bankruptcy Nos. B–80–2700–PHX–RGM, B–81–1221–PHX–RGM.**

**Adv. Nos. 81–467, 81–466.**

United States Bankruptcy Court, D. Arizona.

Feb. 9, 1982.

Gerald K. Smith, Phoenix, Ariz., for debtors.

Amy R. Coy, and Newman R. Porter, Phoenix, Ariz., for Harsh Inv. Corp.

ROBERT G. MOOREMAN, Bankruptcy Judge.

This action constitutes but another chapter in the continuing "litigation soap opera"[1] involving the Bialac family and Harsh Investment Corporation, (HIC).

1. See *In re Bialac*, 15 B.R. 901 (9th Cir. BAP 1981) NO. AZ–81–1048–KLH and AZ–81–1093–KLH (consolidated)

## FACTS

The present controversy between the parties stems from a transaction in 1965 in which members of the Bialac family acting through Rental Development Corporation (RDC) sold an apartment complex and shopping center known as Park Lee Alice Apartments to HIC through its wholly owned subsidiary Harsh Building Company (HBC). The sale was financed by the Federal Housing Administration through a "surplus cash note." In addition to the note, the Bialacs acquired secondary financing in contravention of the rules and regulations set up by the F.H.A. Subsequently, RDC defaulted on this secondary financing and HIC as guarantor paid the principal and interest. HIC then brought suit in Arizona state court against RDC and the Bialac family. In state court proceedings before Judge Sandra D. O'Connor, case No. C–196753, the court found the secondary financing to be void, and held that the surplus cash note was the sole enforceable financing vehicle. In addition, HIC was given a security interest in the surplus cash note, which created the unique situation of HIC having a security interest in a note made by its wholly owned subsidiary HBC.

Rental Development Corporation (RDC) was dissolved by the Bialac family and the note was transferred to the Bialacs as shareholders of RDC in the following manner:

> Samuel and Lee Bialac held a one-third interest; Jerry Bialac held a one-third interest; and Alice Bialac Altman and James T. Bialac each held one-sixth.

After all appeals in Arizona state courts were exhausted HIC sought to foreclose on its security interest in the note against the Bialacs. At this point the Bankruptcy Court first entered the picture when Samuel Bialac filed a Chapter 11 petition (No. 80–2700) on December 2, 1980.

On January 12, 1981, HIC filed an adversary complaint (ADV No. 81–17) seeking relief from the automatic stay on Samuel Bialac's interest in the note. On February 25, 1981, Bankruptcy Judge Edward Davis lifted the stay on Samuel Bialac's one-third interest in the note. As a result of the decision by Judge Davis, HIC prepared to foreclose on its security interest in the note by noticing a sale of the note on June 1, 1981. Minutes before the sale was to be held, James Bialac filed a Chapter 11 petition (No. 81–1221). Rather than postpone the sale, it was determined by HIC that only five-sixths of the note would be sold, thereby attempting to omit James Bialac's interest in the note so as to respect the automatic stay imposed by 11 U.S.C. § 362 on his interest.

Subsequent to the sale, the decision of Judge Davis to lift the stay as to Samuel Bialac's one-third interest was appealed to the Ninth Circuit Bankruptcy Appellate Panels. Judge Davis's decision was affirmed on November 18, 1981, and is reported in In re Bialac, supra.

Also subsequent to the June 1, 1981 sale, HIC brought an adversary proceeding in this court against James Bialac (ADV No. 81–466) in which it sought to lift the automatic stay as to his remaining one-sixth interest in the note. After extended hearings, this court entered an order on October 8, 1981 continuing the stay, noting that at the time the above-mentioned appeal to the Bankruptcy Appellate Panels had not been decided, and also that it would be unjust to lift the automatic stay at that time in light of the equity status of the note. A copy of that opinion is attached.

## ISSUES

The present proceedings comprise two issues which were segregated from prior proceedings concerning the lifting of the automatic stay. In Samuel Bialac's Chapter 11 case, the related adversary proceeding (ADV No. 81–467) questioned whether the sale of five-sixths of the surplus cash note was performed in a commercially reasonable manner. This same argument was raised in an adversary complaint filed by James Bialac (ADV No. 81–466). In addition, James Bialac argues that the sale of five-sixths of the surplus cash note violated the automatic stay with respect to his one-sixth interest in the note, since the sale

diminished the value of his one-sixth interest and adversely affected his subrogation and redemption rights. These issues were consolidated, and testimony and evidence were presented at the trial thereon. The Bialacs seek to have the entire sale of June 1, 1981 set aside, and also seek to enjoin HIC from selling, assigning or transferring any part of the note.

## COMMERCIAL REASONABLENESS

The issue of whether the June 1, 1981 sale of the fractional five-sixths of the surplus note was performed in a commercially reasonable manner will be discussed first. It is therefore necessary to set forth additional facts and circumstances surrounding the sale itself.

On May 22, 1981, HIC noticed a public sale of the entire surplus cash note for June 1, 1981, at 2:00 P.M. Copies of the notice were sent to each of the five judgment debtors and to their counsel by certified mail. Copies were posted in two separate places at the Maricopa County Courthouse. In addition, the notice was published a total of six times in the two largest Phoenix metropolitan newspapers, such notices appearing on May 27, 28 and 29, 1981, in each of the two papers. Notices were also sent to a total of seven individuals who deal in discounted promissory notes and therefore were potentially interested in the sale of the asset. Earlier, by letter dated April 1, 1981, counsel for HIC had asked counsel for the Bialacs to suggest any additional persons who might be interested in bidding on the surplus cash note.

The sale was scheduled for 2:00 P.M., and at 1:13 P.M. on June 1, 1981, James Bialac filed a Chapter 11 petition. Within minutes after filing, a copy of the petition was served on counsel for HIC. At that time counsel for the Bialacs were advised that the sale would continue as to the interests of the four judgment debtors in the surplus cash note who were not involved in the James Bialac Chapter 11 case and that the sale would not include James Bialac's one-sixth undivided interest in the note.

At the sale, counsel for the Bialacs and representatives of HIC were present. In addition, Mr. Jay Golde, a person who had been attracted by the notice of sale, was present. The only bid cast at the sale was that of HIC in the amount of $160,000. The sale was thus consummated with HIC claiming a five-sixths interest in the note.

The Bialacs present two separate grounds for their argument that the sale was commercially unreasonable. First, it is argued that the note that was noticed to the public was not the note that was sold at the sale in that only five-sixths of the note was actually sold. Second, that insufficient information was provided to potential purchasers concerning the financial condition of HIC, the parent and controlling entity of HBC, the maker of the note.

In defense, HIC presents several arguments in support of the validity of the sale. First, it argues that this court lacks jurisdiction in deciding the issue of commercial reasonableness. They point out that with respect to Samuel Bialac, the same issues were raised in arguments made before the Ninth Circuit Court of Appeals in seeking to stay the sale. That court reviewed some of the same deficiencies in the notice of the sale as alleged in the current proceedings, and refused to stay the sale. HIC contends that such a ruling is *res judicata*. HIC also argues that James Bialac lacks standing to contest the sale because his interest was not sold.

At the outset, this court finds and holds that it has jurisdiction over the matters presented. While similar issues were presented to the Ninth Circuit in seeking to stay the sale, a different question is involved in the present proceedings. Here, in addition to alleged defects in the notice of sale, are allegations as to misconduct surrounding the sale itself. This court is looking at a sale that has taken place, while the Ninth Circuit was looking at a proposed sale. Clearly the issue before the court now concerns facts that were not in existence at prior proceedings. We are also guided by the case of *In re Staff Mortgage & Investment Corp.*, 625 F.2d 281 (9th Cir. 1980)

which held with regard to an analogous fact situation that a decision involving a bankrupt in one proceeding does not necessarily prevent the institution of a new proceeding involving the same issues.

While we conclude that the previous proceedings are not a *res judicata* bar to the proceedings before this court, this court will consider the decisions of the Ninth Circuit to be *stare decisis* with respect to the issues of notice that are identical to those issues presented before this court and is guided by the rulings therein.

■■■ As to the issue concerning the standing of James Bialac to contest the validity of the sale, we hold that he has standing in that he alleges injury in fact to his rights including the right of redemption. The relevant inquiry is whether, assuming the practicability of the claim, the debtor has shown an injury to himself that is likely to be redressed by a favorable decision. *Simon v. Eastern Kentucky Welfare Rights Organization*, 96 S.Ct. 1917, 426 U.S. 26, 48 L.Ed.2d 450 (1976). The mere fact that James Bialac's one-sixth interest was not sold does not prevent the possibility of injury having occurred to his property interests in the note.

■ In addition to the above-mentioned jurisdictional objections, HIC makes several substantive arguments in defense of the sale. First it notes that there is no statutory authority for setting aside the sale. It is contended that the controlling statute U.C.C. § 9–507(1) only authorizes an injunction before the sale, and that this pre-sale injunction was refused by the Ninth Circuit. It is also argued that the debtor's sole remedies after the sale are limited to damages and certain defenses against a deficiency judgment. While this argument may be true with respect to proceedings in state court, this court as a court of bankruptcy, is not limited to remedies set forth by state law. In fact, this court has been given expansive authority to "issue any order, process, or judgment necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105.

■ Next, HIC turns to the facts of the sale itself arguing that the standard of commercial reasonableness should be viewed in light of California law for the reason that the sale was an enforcement of a judgment arising out of a loan agreement in which the parties voluntarily chose to have California law govern enforcement of the action. In addition, HIC points out that in prior state court proceedings the Arizona courts made a conclusion of law that California law would control. The distinction between California law and the law of Arizona is that under the California Commercial Code § 9504 precise requirements for a public sale are set forth. HIC alleges that all these requirements were met in carrying out the sale of the surplus cash note. In addition, HIC argues that even under Arizona law, the sale was commercially reasonable. Based upon the facts and law presented, this court holds that regardless of which choice of law is made, the sale was conducted in a commercially reasonable manner. The concept of "commercial reasonableness" is defined in part in A.R.S. § 44–3153(B) where it states:

B. The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner. *If the secured party either sells the collateral in the usual manner in any recognized market therefor or if he sells at the price current in such market at the time of his sale or if he has otherwise sold in conformity with reasonable commercial practices among dealers in the type of property sold he has sold in a commercially reasonable manner.* (Emphasis added.)

The court further finds that the spirit and the letter of the law concerning a "commercial reasonableness" was followed in the sale of the surplus cash note.

The Bialacs also argue that since only five-sixths of the note was sold whereas the notice was for the sale of the entire note, the sale was commercially unreasonable.

Also on the issue of commercial reasonableness, since the purpose of notice is to attract interested investors, the court finds from the evidence presented that it was reasonable to sell a lesser portion of the note than what was actually noticed for sale.

Finally, the Bialacs argue that certain current financial information of HIC was not provided to potential investors. While testimony indicated that the most recent internal financial statements were not made available, it was also shown that the formal financial statements of the previous year were in the hands of the attorneys for the Bialacs. The record discloses that the attorneys for HIC were reluctant to comment on almost anything brought up at the sale for fear of jeopardizing its validity and therefore referred any questions to the attorneys for the Bialacs. No evidence was presented indicating that HIC or its attorneys engaged in intentional nondisclosure of material information that would alter the legal consequences of the sale. Therefore, this court, based upon the lengthy litigation posture of this case, holds that any financial information not disclosed by the parties at the time was not materially defective to the sale.

### VIOLATION OF THE AUTOMATIC STAY

The court now turns to the issue concerning whether the sale of five-sixths of the surplus cash note violated the automatic stay with regard to James Bialac's interest in the note.

James Bialac argues that the partial sale of the note altered certain of his property rights in the note including his right to redeem the note by paying off the amount owed in violation of subdivisions (1), (2), (4), (5) and (6) of Section § 362(a) of the Bankruptcy Code. As he explains it, before the sale, he had the right to pay $460,000 and own, free and clear of HIC's lien, the entire surplus cash note, or if the other owners contributed proportionately, he had the right to pay $76,667 and acquire his one-sixth interest. After the sale, he had the right to acquire only one-sixth of the surplus cash note on the payment of $300,000. Therefore, after the sale James Bialac potentially would have to pay 65% of the debt to retain one-sixth, as contrasted to 17% before the sale.

In contrast, HIC argues that James Bialac had no tangible property rights, but merely an opportunity to acquire a property right and that this mere opportunity to acquire a right is not property of the estate as defined in 11 U.S.C. § 541.

This remaining issue as framed by the above arguments can be condensed into the following analysis. First, the court must decide if James Bialac had a right to redeem the property prior to the sale. If such a right existed, it must next be determined whether or not this right is "property of the estate" as defined in the Bankruptcy Code, 11 U.S.C. § 541. Finally, if the right to redeem is property of the estate, was it altered in a manner contrary to the relevant provisions of 11 U.S.C. § 362(a) by the sale of five-sixths of the surplus cash note.

A debtor's right to redeem collateral in Arizona is found in A.R.S. § 44–3152 which states:

> At any time before the secured party has disposed of collateral or entered into a contract for its disposition under § 44–3150 or before the obligation has been discharged under subsection B of § 44–3151 the debtor or any other secured party may unless otherwise agreed in writing after default redeem the collateral by tendering fulfillment of all obligations secured by the collateral as well as the expenses reasonably incurred by the secured party in retaking, holding and preparing the collateral for disposition, in arranging for the sale, and to the extent provided in the agreement and not prohibited by law, his reasonable attorneys' fees and legal expenses.

Clearly this statute gave James Bialac a pre-foreclosure right of redemption. While the related rights of contribution and subrogation against codebtors may or may not come into existence until after he exercised his right to redeem, the right to redeem itself was in existence before the sale.

HIC argues that it has an unconditional right to proceed against codebtors in a Chapter 11 case noting the absence of any prohibition to such action in a Chapter 11 context as compared in Section 1301 which prohibits collection efforts against codebtors of Chapter 13 petitioners on consumer debts.

While there may be an implied right to proceed against property of a codebtor, such an action cannot be used to destroy certain intangible property rights of a codebtor in bankruptcy. To allow such would frustrate the underlying purpose of Section 362 which is to freeze the property rights of the debtor and prevent the usurpation of such property interests by his creditors. Therefore, any action taken by HIC against the property interests of the codebtors of James Bialac must be done subject to the legal and equitable property interests of James Bialac in the affected property.

The broad sweep of the automatic stay was expounded in 2 *Collier on Bankruptcy* ¶ 362.04 (15th Ed.) where it states:

> The stay of section 362 is extremely broad in scope and aside from the limited exceptions of subsection (b) should apply to almost any type of formal or informal action against the debtor or the property of the estate. It should be observed that one of the benefits of the stay is creditor protection in a manner consistent with the promotion of the bankruptcy goal of equality of distribution. Subsection (a) simply provides for an automatic stay, applicable to all entities, of a wide variety of actions listed in subsections (a)(1) through (a)(8). While the language is from time to time duplicative little is omitted.

The question as to whether the right to redeem is a "legal or equitable interest" as contemplated by 11 U.S.C. § 541, has been discussed in other jurisdictions. Two opinions have held that the post-foreclosure right to redeem real property is property of the estate under 11 U.S.C. § 541. See *Bank of Commonwealth v. Bevan*, 13 B.R. 989 (D.C.,1981), and *In re Johnson*, 8 B.R. 371 (Bkrtcy.D.Minn.1981), 3 CBC 2d 569. See also 4 *Collier on Bankruptcy*, ¶ 541.07[3] (15th Ed.). These cases also granted a stay of the running of the statutory redemption period pursuant to either 11 U.S.C. § 362 or § 105.

The issue before this court is somewhat different from that in the above cases. Here the right to redeem is *pre*-foreclosure. In addition, the person alleging the existence of the right holds a partial interest in the collateral in question, which partial interest was not sold. Therefore, we are not concerned here with the typical situation of a debtor seeking to utilize the automatic stay to protect a post-foreclosure right of redemption by tolling a set time period. Here the debtor is seeking in essence to use Section 362 as a means of preventing the natural expiration of his *pre*-foreclosure redemption right by the occurrance of the foreclosure sale.

At this point the question arises as to whether Section 362 was designed and intended to afford this form of requested relief.

The following legislative history sets forth the purpose of Section 362(a) as follows:

> The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and *all foreclosure actions* . . . . The automatic stay also provides creditor protection. Without it, certain creditors would be able to pursue their own remedies against the debtor's property. Those who acted first would obtain payment of the claims in preference to and to the detriment of other creditors. Bankruptcy is designed to provide an orderly liquidation procedure under which all creditors are treated equally. (Emphasis added.) House Report No. 95–595 at p. 340, U.S. Code Cong. & Admin.News 1978, p. 6296.

With the above mentioned legislative purpose in mind, we hold that the debtor James Bialac's right to redeem the entire surplus cash note is subject to the protec-

tion of 11 U.S.C. § 362(a), and that this right was affected by the sale of the five-sixths of the note.

In particular we feel that the consequential destruction of James Bialac's right to redeem constitutes an act in contravention of Section 362(a)(4). This conclusion is guided by the following excerpt from *Collier on Bankruptcy*:

> More importantly, paragraph (4) covers both judicial and non-judicial actions against property of the estate and, as such, is largely consistent with the stays afforded by the Rules and the Act. A wide variety of actions would be stayed automatically including, by way of illustration, judicial and private foreclosure and self-help remedies against collateral such as by notification of account debtors. Paragraph (4) reflects the broad approach taken in drafting section 362 and to an extent duplicates the language of other paragraphs. By reason of the broad jurisdiction of the court and sections 542 and 543 the stay will apply to secured creditors in possession of collateral whether by aid of a custodian or not, an even seemingly trivial action may be affected. The courts will be required to interpret the stay in the light of business reality and the basic purpose of the stay and not as a trap for the unwary. As an ordinary rule, the non-debtor party should when in doubt assume that the stay applies and seek relief by appropriate proceedings in the bankruptcy court. Ample means for prompt and informal relief are present in section 362 and elsewhere in the Code. Often modification of the stay will suffice rather than the more extreme step of vacating it altogether.

See 2 *Collier on Bankruptcy*, ¶ 362.04[4] (15th Ed.)

██ In structuring and fashioning the relief to be given the debtor James Bialac, this court utilizes the equitable powers created in 11 U.S.C. § 105. Since the only property right that was affected was his right to redeem the property, this right is hereby reinstated, but only to the extent set forth hereinafter.

James Bialac's right to redeem commenced at the time of default of the judgment of $460,000 and was to terminate at the moment the foreclosure sale was finalized. Before this latter event occurred, his bankruptcy petition was filed. Therefore, this court, in order to fashion equitable relief for the debtor, grants an additional sixty days to pay and redeem the note at issue after the court fixes and determines the amount due in accordance with A.R.S. § 44–3152, and such other matters as are necessary to administer the Chapter 11 proceedings of James Bialac.

Should the debtor fail to take advantage of his right to redeem within that period by paying the full amount of the $460,000 judgment and any allowed interest and costs, his right is terminated and the foreclosure sale of the surplus cash note to HIC will remain intact.

Assuming the debtor James Bialac does exercise his right of redemption within the above time limits, the prior foreclosure sale is rescinded, and HIC as purchaser will be credited for its payment of $160,000.

██ While it may be technically argued that HIC violated the automatic stay, the court finds HIC acted under a good faith assumption that by not selling the one-sixth interest of James Bialac, it was respecting the automatic stay, and therefore no sanctions are considered herein.

Pursuant to Fed.R.Civ.P. 52, as adopted by Rule 752 of the Rules of Bankruptcy Procedure, this opinion and order shall constitute findings of fact and conclusions of law herein.